**LUCKING et al. v. UNITED STATES, and five other cases.**

(Circuit Court of Appeals, Seventh Circuit. September 27, 1926. Rehearing Denied November 11, 1926.)

Nos. 3719–3722, 3726, 3748.

**1. Indictment and information ⊂⇒86(2).**

Under Rev. St. § 5440, now Criminal Code, § 37 (Comp. St. § 10201), indictment charging formation and existence of conspiracy in Missouri, having as an object the transportation of whisky into and through Indiana, *held* to sufficiently charge existence of conspiracy in district of Indiana.

**2. Indictment and information ⊂⇒86(2).**

Under Rev. St. § 5440, now Criminal Code, § 37 (Comp. St. § 10201), allegation that an overt act to effect a conspiracy elsewhere formed was committed within district where indictment is found is sufficient to show jurisdiction.

**3. Conspiracy ⊂⇒47.**

In prosecution, under Rev. St. § 5440, now Criminal Code, § 37 (Comp. St. § 10201), of numerous defendants for conspiracy to violate National Prohibition Act (Comp. St. § 10138¼ et seq.), evidence *held* sufficient as to particular defendants, and insufficient as to others, to sustain conviction.

**4. Criminal law ⊂⇒1119(4).**

Alleged improper remarks of district attorney, not disclosed by bill of exceptions, are not reviewable.

In Error to the District Court of the United States for the District of Indiana.

William Lucking, George R. Landon, Edward J. O'Hare, Michael Whalen, Nathan Goldstein, and Harry F. Stratton, with others, were convicted of conspiracy to violate the National Prohibition Act, and they bring error. Reversed as to defendants William Lucking, George R. Landon, John Connors, Anthony Foley, Robert E. Walker, and Edward O'Hare, and remanded, with directions; otherwise, affirmed.

The indictment returned in the Indiana District Court October 31, 1925, charged that 39 persons, named as defendants, continuously from May 1, 1923, to March 1, 1925, "at the city of St. Louis, in the state of Missouri, did unlawfully * * * conspire * * * together and with each other, and with George Remus (and five other persons named) and divers other persons, whose names are to the grand jury unknown, to commit divers offenses against the United States, to wit, to unlawfully * * * violate that certain Act of Congress of October 28, 1919, known and designated as the National Prohibition Act, and particu-

14 F.(2d)—56

larly to violate section 3 of title II of said act, in that they, the said defendants, * * * did then and there unlawfully, * * * conspire * * * together, * * * and with George Remus (and the others named) and divers other persons to the grand jury unknown, to then and there and thereafter, and in the state of Missouri, the state of Indiana, the state of Illinois, and the state of Ohio, unlawfully, willfully, knowingly, and feloniously barter, transport, deliver, furnish and possess large quantities of intoxicating liquor, to wit, whisky, * * * without obtaining permit or permits so to do, and which whisky, at the time of the formation of the said conspiracy herein alleged, consisted of 30,000 gallons, and was contained in 891 barrels and stored in the warehouse known as the Jack Daniel Distilling Company bonded warehouse at No. 3960 Duncan avenue, in the city of St. Louis, state of Missouri. And the grand jury * * * do further charge and present that at the hereinafter stated times, in pursuance of and in furtherance of and to effect the object of said conspiracy, the hereinafter named defendants and persons did and performed the following overt acts in the state of Indiana: Overt acts."

Here follow seven allegations of acts, in substance: (1) That defendants Lucking and Landon, in Cincinnati, Ohio, delivered $50,000 to one Garver for use in part payment of the Jack Daniel whisky, and caused same to be transported by Garver through Marion county, Ind., to St. Louis, Mo.; (2) that defendant Marcus transported an electrical pump from Cincinnati through Indiana to the Jack Daniel Distilling Company in St. Louis; (3) that Harry Boyd transported 110 gallons of the Jack Daniel whisky from St. Louis, through Marion county, Ind., to Cincinnati; (4) that Harry Boyd on another occasion likewise transported 115 gallons of said whisky into Indiana; (5) that defendants Marcus and Doncaster transported 200 gallons of said whisky from St. Louis through and into Marion county, Ind.; (6) that Harry Stratton and George Klug transported 258 gallons of whisky from St. Louis, through Indiana, to Cincinnati; (7) that Brink and Lenhart transported 100 gallons of whisky at St. Louis into Shelby county, Ind.

Of those indicted 3 pleaded guilty, and of those tried 3 were found not guilty and 22 guilty, of whom 14 of those sentenced have prosecuted writs of error. Of these, two (Hellmich, United States collector of internal revenue at St. Louis, and Kinney, who

acted as gauger at the distillery) dismissed their writs, leaving 12 pending.

Remus, the main witness for the government, in the three or four years preceding 1923, had purchased quite a number of distilleries and disposed of the whisky purchased, some legitimately and some otherwise, and was under sentence of imprisonment for certain of these operations. The Jack Daniel Distilling Company was a legitimate concern at St. Louis, having about 30,000 gallons of tax unpaid whisky in its bonded warehouse at the distillery, and Remus negotiated for the purchase of the plant exclusive of buildings. On consummation of the deal, Remus and his employees and associates went into possession, and executed their scheme to surreptitiously remove the whisky from the bonded warehouse. Some of the officials in charge were corrupted, and the removal was effected through bringing to St. Louis from Cincinnati, which was Remus' base of operations, an electric pump, and by means of a hose running into the bonded warehouse pumping the whisky from the barrels into containers outside of it, whereby practically all the whisky was withdrawn, and water substituted in the barrels. The whisky withdrawn was temporarily taken to places in St. Louis, wherefrom it was distributed, largely by automobiles and trucks much of it through or into Indiana as charged, considerable of it to Cincinnati, where it was ultimately distributed or was confiscated. Further relations of the several plaintiffs in error are discussed in the opinion.

Thomas L. Pogue, of Cincinnati, Ohio, and Levi Cooke, of Washington, D. C., for plaintiffs in error Lucking and Landon.

T. J. Rowe and Charles A. Houts, both of St. Louis, Mo., Levi Cooke, of Washington, D. C., and John T. Murray, of Chicago, Ill., for plaintiffs in error O'Hare and others.

T. J. Rowe and William Baer, both of St. Louis, Mo., and Levi Cooke, of Washington, D. C., for plaintiff in error Whalen.

Charles A. Houts, of St. Louis, Mo., and Levi Cooke, of Washington, D. C., for plaintiffs in error Goldstein and Stratton.

Albert Ward, of Indianapolis, Ind., for the United States.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] The indictment is sharply challenged by all plaintiffs in error on the ground that no conspiracy is charged in the district of Indiana, and no venue is laid in Indiana, but only in Missouri. That part of the indictment which describes the conspiracy charges its formation and existence in Missouri, and while it is alleged that one of the objects of the conspiracy was to transport the whisky into or through Indiana, there is no direct allegation in that part of the indictment charging the existence of the conspiracy in that district. The government contends that the allegations of the overt acts which are charged to have been done in furtherance of and to effect the object of the conspiracy sufficiently charge the carrying of the conspiracy into Indiana and its existence there, and that such allegation of the venue in Indiana is sufficient under the authority of Hyde v. Shine, 199 U. S. 62, 25 S. Ct. 760, 50 L. Ed. 90; Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Brown v. Elliott, 225 U. S. 392, 32 S. Ct. 812, 56 L. Ed. 1136.

Counsel for plaintiffs in error contend, not that a conspiracy formed elsewhere is not indictable in a district wherein one or more of the conspirators does an act in its execution, but that the indictment in question does not charge the conspiracy to have had existence in Indiana, in manner as they contend was charged in the cases cited. It seems that the indictment in the Hyde Cases did directly charge the bringing of the conspiracy from California, where it was formed, to the District of Columbia, and its existence there, where certain papers to effect the conspiracy had been filed, and wherein the indictment was found. But in Brown v. Elliott, supra, the indictment is in its essential features too nearly like this one to admit of distinction. The conspiracy there was alleged to have been formed at a place unknown, which does not in principle distinguish it from the allegation of a place outside of the district where the indictment is found. It alleged that one of the objects of the conspiracy was to deposit letters in the Omaha post office in execution of an alleged scheme to defraud, just as here it is alleged that one of the purposes of the conspiracy was unlawfully to transport liquor into or through Indiana. There, as here, the scheme was, in differing language, alleged to be continuous, and the allegation of the overt act (the depositing mail in Omaha) was held to bring the conspiracy into that district, and indeed that the effective date from which the statute of limitations would run upon the indictment for the conspiracy there was, not that of its formation, but of the commission

of the overt act there, whereby the statutory crime of conspiracy became complete.

[2] The usual form for indictments under section 5440, Rev. St., now Cr. Code, § 37 (Comp. St. § 10201), is in two divisions, the first charging and describing the so-called conspiracy, and the other setting forth what are generally called "overt acts." The statute does not prescribe any form, and indeed does not employ the term "overt acts." The cases cited seeming authoritatively to have established there is jurisdiction in a district wherein a conspirator commits an overt act to effect a conspiracy elsewhere formed, it would seem to follow that allegation anywhere in the indictment of the commission of overt acts within the district where the indictment is found, would be sufficient. Indeed, in this situation the allegation of the overt acts serves two distinct functions: (a) Statement of such acts as required by the statute in order to charge the offense which the statute denounces; and (b) laying the venue in such district, and giving the court thereof jurisdiction, agreeably to the applicable decisions. But, when this is once stated in the indictment, it is there for all purposes, and need not be repeated. In Grayson v. United States, 272 F. 553 (6 C. C. A.) it would appear from the opinion that the indictment there considered was quite similar in form and principle, and upon review of the authorities was held good.

Concluding as we do that the indictment is sufficient, the contention of variance between the indictment and the proof, predicated largely on the assumption that the proof did not show the conspiracy in Indiana, or a conspiracy to transport whisky into Indiana, likewise fails.

Of the other errors assigned, we deem worthy of discussion only such as assert the absence of any evidence in the record to sustain the verdict and judgments against the several plaintiffs in error.

### Harry F. Stratton.

[3] Remus testified that the Jack Daniel whisky which Stratton transported through Indiana Stratton purchased outright at St. Louis—350 gallons at $30 per gallon—giving his check for $10,500. It is insisted that his act of actually buying the liquor with intent to transport it, and transporting it accordingly, does not establish the crime charged, and that, though he may be guilty of the substantive offense of transporting the whisky, he is not shown to be guilty under section 5440, Rev. Stat. U. S. If this were all of Stratton's participation, it might be questionable whether the evidence showed his participation in the conspiracy. It seems from the testimony of several witnesses that, apart from this alleged purchase by him, he was a sort of factotum for Remus; that on some occasions at St. Louis he assisted men who were to drive cars for transporting liquor in finding the loaded cars; and that at Cincinnati, where much of the whisky was taken, he was well informed of its location, and had participation in its removal for disposition by others. Remus' wife, who from the evidence appears to have had actual knowledge of and participation in the conspiracy, was with him on one of the automobile trips through Indiana. This in our judgment affords such evidence of guilt as to make the verdict of the jury and judgment thereon binding upon us.

[4] Improper remarks of the district attorney respecting Stratton are urged upon us, but we are not at liberty to consider them, inasmuch as such are not disclosed by the bill of exceptions herein, but only raised by assignments of error and briefs of counsel.

### William Lucking and George R. Landon.

From the government's evidence it appears that they are men of means living in Cincinnati, who had been and still were interested with Remus in the acquirement and disposition of other distilling properties, particularly one known as Hill & Hill, all of which, so far as the evidence discloses, were legitimate and conducted in a lawful manner. The Hill & Hill deal involved several hundred thousand dollars, and settlement between them and Remus had not yet been made. Remus wanted from them $50,000 to help close the Jack Daniel deal, which involved in all about $130,000. At Cincinnati he met Lucking, who was about to leave for the East, and asked him for the amount, saying he was buying a distillery at St. Louis, and said, if there were additional charge for the money, a bonus would be paid. He later saw Garver, a Cincinnati lawyer, who transacted business for them, as well as for Remus, and Garver arranged with Lucking and Landon for advancing the money to Remus. One of them gave him a personal check for $20,000, and they signed with Garver notes for $30,000, all of which was cashed at a Cincinnati bank, and the money taken by Garver to St. Louis, where the amount, less a bank discount on the notes, was paid over by Garver to help Remus close the Jack Daniel deal. It was testified that nothing was communicated to Lucking and Landon about the nature of the proposed transaction, be-

yond what has been stated; that neither of them acquired or had any interest in the deal beyond compensation they might receive for the immediate advancement of the money, and the record does not show either of them to have been at St. Louis or elsewhere than at Cincinnati in relation to the business. It was testified that afterwards Remus paid Garver the $30,000 to take up the notes he had signed. This, in substance, is all the record shows bearing on the connection of these men with the transaction or on their knowledge, conduct, motives, and purposes. We cannot presume the existence of relations and connections not disclosed by the record, and surely what there appears supplies no evidence of their criminality.

### Morris Multin.

As to Multin there is abundance of evidence in the record to sustain the verdict. Remus' testimony showed him in the transaction from the beginning—in the negotiations for the purchase, supplying on his own behalf or for others nearly $30,000 of the purchase price, arranging for the removal of the whisky from the bonded warehouse, and for place of temporary storage, and for its removal and transportation as was done.

### Harry Levin.

Closely associated with Multin was Levin. There was evidence that his participation was very similar to that of Multin. Remus testified that both told him that they had arranged to have the whisky taken from the warehouse and stored on a nearby farm. Further details showing his full connection with the conspiracy need not be mentioned.

### Michael Whalen.

The record shows Whalen to have been active in the acquirement, handling, and disposition of the Jack Daniel whisky, He supplied part of the purchase price, participated in the negotiations, and was in close association with those who were handling the matter. He it was who vouched to the police for Meininger, Remus' manager of the distillery, who had given an assumed name when the police sought to take him on suspicion at Whalen's saloon. It might be said that all of these things alone, while strongly suspicious, might not prove his guilt; yet when taken in connection with Remus' testimony that Whalen conversed with him respecting storage places for the whisky, and had arranged outlet for it near his saloon, it is sufficient to establish a guilty participation.

The judgment against him cannot be disturbed.

### John Connors.

The record discloses much evidence tending to show the guilt of one Connors, but close examination makes it apparent that the Connors referred to was not the defendant, but his brother, M. J. Connors, who died before the finding of the indictment herein. M. J. was one of the stockholders of the Walker-White Bill-Posting Company of St. Louis, to whose place considerable part of the Jack Daniel whisky was brought for temporary storage and for delivery to those who were to take it away. M. J. was shown to have been in actual charge of the place and assisted in handling the whisky there.

Witness Boyd mentioned seeing John Connors at the Rex Realty Company's office wherein the Jack Daniel whisky business was transacted, but he described him as the Connors who was killed. Remus also, in mentioning conversations with Levin and Connors for making arrangements with the Walker-White Posting Company, explained it was the Connors who was dead, and he stated that so far as he can remember he never had any conversation with the defendant Connors, who during the trial stood up in court for Remus' identification. We find nothing in the record which inculpates John Connors.

### Daniel O'Neil.

While it appears that O'Neil was conversant with the deal for the whisky and present at some of the negotiations therefor, which alone might not raise more than a suspicion against him, Remus testified to a conversation at Whalen's saloon in St. Louis with Whalen and O'Neil, wherein they told him of storage places for the whisky, and that they had arranged an outlet for it near Whalen's place. While evidence of his guilt may not be so strong as with some others, we cannot hold that there is an absence of evidence to warrant his conviction.

### Anthony Foley.

All that is shown as to Foley is Remus' statement that arrangements were made for the Foley establishment or farm for storing temporarily the whisky looted from the warehouse; that Multin and Levin told him (Remus) they had arranged for the Foley farm, and that they made telephone calls to the Foley farm requesting that barrels of liquor be brought down; that he (Remus) supposed it was defendant Foley that was meant, but that he had never met him. We

search vainly for any evidence in the record tending to show that defendant Foley owned or had any sort of interest in the farm referred to as the Foley farm, or that he is the person of whom Remus testified, or that he knew that illicit liquor was being brought to the place. In this state of the record we must conclude that no evidence of his guilt appears in the record to sustain the judgment against him.

### Robert E. Walker.

The evidence concerning this man is by two witnesses—Shannon, who testified that, in an application by the Rex Realty Company for renting an office, Levin and M. J. Connors, who signed the application, gave Walker as reference, and that of Prohibition Inspector Hansen to the effect that about 60 days before the trial he questioned Walker, who replied that he (Walker) was president of the Walker-White Bill-Posting Company, which was a corporation. This is all the record discloses respecting him. It does not appear that he was ever inquired of concerning the Rex Realty lease, and surely no inference of guilt is deducible from the fact that M. J. Connors, who was associated with him in the bill-posting business, had given his name as reference for reliability on a lease. As to his presidency of the company, there is no evidence of the extent of his activity with its affairs, or that during the time in question he was ever in the room where M. J. Connors had permitted the whisky to be brought. For anything appearing in the record to the contrary, he may have been in the uttermost parts of the earth during all that time; but, wherever he was, nothing appears to indicate that he as much as ever heard of the Jack Daniel whisky or of any transaction concerning it. We find in the record no evidence whereon to base the judgment against him.

### Nathan Goldstein.

The case against this defendant was made mainly, if not wholly, by Remus. As against Goldstein it was not testified that he engaged in the actual carrying out of the conspiracy, or that he received any profit therefrom; but in order to show one guilty of participation in a conspiracy it is not essential that it appear that he helped effect its object, or that he profited thereby. No one testified to any words spoken to or by Goldstein directly referring to any plan or purpose to do unlawful things with reference to the whisky in question. Whatever of lawful evidence there appears against him is in the nature of situations and circumstances pointing toward his guilt.

It appears he was an old-time practical politician and officeholder in St. Louis, wherein he might be useful to Remus' unlawful undertaking. Remus testified that it became necessary in the proposed transaction to give a large bond to secure the owners of the real estate whereon the distillery and warehouse were located against loss by reason of Remus' operation or use of the plant, the real estate not being included in Remus' purchase; that he was recommended to Goldstein as an insurance broker or agent who had procured the writing of a similar bond by a surety company which he (Goldstein) represented in St. Louis; that he was introduced to Goldstein as a millionaire distillery owner, and stated that he had purchased a number of distilleries, and wished this bond; that in conversation he inquired as to Goldstein's relations with Hellmich, who was collector of internal revenue at St. Louis, and Goldstein said he had appointed Hellmich to that office, and that Hellmich would give him any assistance he wanted; that afterwards Goldstein told Remus he had better meet a Mr. Kratz, and that Goldstein telephoned Kratz, who came to the office and met him. Hellmich and Kratz soon became Remus' effective instruments for robbing the warehouse of the whisky, Kratz acting as a sort of go-between as to Remus and the collector, and being paid from time to time, as the whisky was removed by Remus, something over $30,000 for distribution among the various conspirators. Hellmich and Kratz were included in the indictment here; Hellmich being convicted and sentenced, withdrawing a writ of error which he had prosecuted, and Kratz dying before the trial. There was evidence of Kratz's statement to Remus that out of the money he received he would take care of Goldstein, but this was not in Goldstein's presence and was admitted only as against Hellmich; likewise a statement by a revenue officer that Hellmich told him Goldstein had inquired over the phone whether it would be all right with Hellmich to have the distillery robbed, but Goldstein was not present at this conversation, and it was also admitted only as against Hellmich. Whatever influence such testimony might nevertheless have had against Goldstein, there is no complaint of the court's ruling respecting it.

The majority of this court are of the view that the situation and the circumstances appearing made it fairly a question for the jury to determine whether or not the indicat-

ed facts afforded sufficient evidence tending to show that Goldstein was the conscious and effective agency whereby the important parties to this conspiracy were brought into operative relation. This being so, his own innocent explanation of some of the suspicious circumstances, and denial of others, and the evidence of character witnesses on his behalf, would make it the function of the jury to decide where the truth lay as between conflicting evidence, and in such situation the judgment against him must stand.

### Edward O'Hare.

It appears from the record that O'Hare, a lawyer, or at least connected with a law office at St. Louis, in December, 1923, went to an official at St. Louis of the Fidelity & Deposit Company, a surety concern, to get them to become surety on appeal bonds of Marcus and Doncaster, who had been convicted at Indianapolis for unlawful transportation of some of the Jack Daniel whisky. The company requested a deposit of $10,000 as indemnity, and O'Hare brought them the money, and the bonds were executed. About the same time one Rowe, a St. Louis lawyer, with whose office O'Hare seems to have been connected, brought the same company $20,000 to indemnify it upon its signature of other such bonds, or perhaps original bail bonds, which it likewise executed. Early in 1924 the company's liability on the first-named bonds having evidently terminated, it made a check to "Rowe Attorney" and "O'Hare Attorney," by whom the check was indorsed, and banked to O'Hare's account. On one or two occasions O'Hare inquired of the company as to the termination of its liability on the other bonds, but it was testified that at the time of the trial the company still held the $20,000.

The only other evidence as to O'Hare was by Remus saying that once they met and talked at the Rex Realty office. If that conversation was in relation to Remus' lawbreaking projects, and advice by the lawyer of the safest way they might be carried out, including preparation in advance for defending those who might be arrested in the venture, through holding in readiness lawyers to defend them, and providing ample funds for obtaining such bonds as might be required, proof thereof would certainly stamp the lawyer as a criminal conspirator of deepest dye, who should be promptly and severely punished and scourged from the bar and profession which he thus disgraces. That there are such instances is, we fear, only too true; but if, on the other hand, in that conversation nothing of an incriminating nature was suggested, one's righteous indignation over possible situations must be curbed. Since the record contains not so much as a single word of the conversation, neither the jury nor this court has the right to assume it was of a criminal nature. To be sure, the fact of such conversation, coupled with other facts and circumstances showing guilt, might support the judgment; but it does not find support in the only other record fact of his bringing the money to indemnify the surety company, a circumstance, innocent in itself, which, in connection with others appearing of record, might afford basis for a verdict of guilt. But we are of opinion that the bare fact of a conversation with Remus at the Rex Realty office, plus only the conveying of the money to the company, and the subsequent receipt by him of the money, and his inquiry as to termination of liability on the other bonds, fall short of affording a legal basis for the verdict and judgment.

The judgments of the District Court against plaintiffs in error Harry F. Stratton, Morris Multin, Harry Levin, Michael Whalen, Daniel O'Neil, and Nathan Goldstein are, and each of them is, affirmed. The judgments against William Lucking, George R. Landon, John Connors, Anthony Foley, Robert E. Walker, and Edward O'Hare are, and each of them is, reversed, and as to them and each of them the cause is remanded to the District Court, with direction to grant them a new trial.