**DALE v. UNITED STATES (seven cases).**
Nos. 4823–4825, 4827, 4829–4831.

Circuit Court of Appeals, Seventh Circuit. Aug. 7, 1933.

Rehearing Denied Oct. 10, 1933.

Clarence W. Nichols and Dixson H. Bynum, both of Indianapolis, Ind., and William A. McClellan, of Muncie, Ind., for appellants.

Val Nolan and George R. Jeffrey, U. S. Attys., and Alexander G. Cavins and Telford B. Orbison, Asst. U. S. Attys., all of Indianapolis.

Before ALSCHULER and EVANS, Circuit Judges, and WILKERSON, District Judge.

ALSCHULER, Circuit Judge.

The indictment which eventuated in these appeals charges the thirteen defendants therein named in a single count with a conspiracy with each other, and with others named and others unknown, to commit an offense against the United States, "which offense was that they, the said persons named and unknown, would then and thereafter and within the said division, unlawfully, knowingly and feloniously, and for sale for beverage purposes, manufacture, possess and transport intoxicating liquor which would contain one half of one per cent or more of alcohol by volume, and would be fit for beverage purposes, and that they would unlawfully, knowingly and feloniously and for beverage purposes, sell and transport said liquor within said division and that they would unlawfully and knowingly and within said division, maintain places where such liquor would be so unlawfully made, kept and sold."

Various overt acts are enumerated.

Defendant Stilson was not apprehended. Johnson pleaded guilty. The others were tried, and all except Hoover were convicted. Parkhurst alone does not appeal. Flatters and Kubeck dismissed their appeals. Appellant Dale was the mayor of Muncie, Ind.; Massey, the chief of police; Ellis, a member of the board of safety; Davis, Horstman, Nelson, and Powell were city policemen.

The several appellants were sentenced to various terms of imprisonment, and some of them also to pay fines. Each made similar assignment of errors, the first three dealing with the court's refusal to direct a verdict for the defendant, and in entering judgment on the verdict; the fourth and fifth alleging a want of evidence to sustain the verdict and judgment; the sixth asserting error in over-

ruling motion in arrest; and the seventh and eighth dealing with allegedly improper statements made to the jury by the district attorney in his closing argument.

The enumeration of "contested issues" in the brief for appellants is an abbreviated statement of the assignment of errors as stated, with the addition of "3," an allegation of error in overruling motions for new trial; and under the title "errors relied upon" the assignment of errors is again set out with the same additional specification as last above.

Before considering the paramount issue of whether there is substantial evidence to support the judgment, we will take up some questions of comparatively minor importance which appellants raise. The first has to do, not with the transcript of record as filed, but with matters arising since the appeal was lodged.

■ It seems that one Duncan had given testimony which reflected especially on Dale and Massey. After the appeals had been perfected, one of the attorneys for the appellants presented to this court an affidavit setting forth that, since the perfection of the appeal, he had learned that Duncan desired to recant the testimony he had given, and that on interviewing him in a jail where he was confined the attorney found this to be the fact, and that he had asked leave of the district judge to have Duncan examined; that the district judge declined to act, on the ground that through the appeal that court had lost jurisdiction of the case. The attorney nevertheless examined Duncan before an official court stenographer through questions and answers, and a transcript of the examination was signed and sworn to by Duncan and presented to this court with an application for an order by this court to permit the District Court to consider such transcript, and any further evidence in relation thereto that the District Court might hear, in connection with the motion for a new trial, and to certify to this court its conclusions respecting such motion for new trial.

It appears from Duncan's testimony before the jury that before testifying he had made a written statement, which was in the possession of appellants' attorneys, in contradiction of the testimony he later gave in court, but that, when questioned about it, he testified in effect that the written statement was procured from him under duress and was not true, and that the truth was as he had testified. In opposition to the application here for leave to have him examined by the District Court, there were presented to this court the affidavits of three presumably reputable persons, two women and one man, to the effect that Duncan had stated to them, or in their presence, in substance that a recanting statement had been demanded of him by persons in the interest of appellants, under threats of personal injury in case he declined to give it; and that, in protection of himself, he was going to give the statement, but that he wished to have these persons present within hearing distance but in concealment when it was done, and stating to them that the evidence he gave at the trial was true.

We thus have the diametrically opposite statements of this witness as testified by him before the jury, as well as the very contradictory statements appearing before us. Under these circumstances, as well as from various manifestations in the record of Duncan's unreliability, and as well as the state of the record without Duncan's testimony, we do not believe any good purpose would be served by granting appellants' motion to refer the matter to the District Court for its consideration in connection with a motion for a new trial; and in the exercise of our discretion as to such matters [Perry v. United States, 39 F.(2d) 52, 54 (C. C. A. 5)] the application for such reference to the District Court is hereby denied. Larrison et al. v. United States (C. C. A.) 24 F.(2d) 82.

■ The only other contention made, apart from that of sufficiency of the evidence, is in regard to alleged statements in the closing argument of the district attorney. These are made to appear solely through their incorporation in the motions for new trial, other than which nothing thereon appears in the record. They are not included in the bill of exceptions. For the most part they consist of alleged statements of fact of which appellants say there was no evidence. No objections to the statements were made or exceptions taken. The court was not asked to make a ruling thereon while the jury was in the box. One cannot permit such statements to go unchallenged at the time when, if improper, they might be corrected, and afterwards, when too late to correct them, bring them, for the first time, to the court's attention. De Bonis v. United States, 54 F.(2d) 3 (C. C. A. 6); Carlisle v. United States, 194 F. 827 (C. C. A. 4); Marco et al. v. United States, 26 F. (2d) 315 (C. C. A. 9); McIntosh v. United States, 1 F.(2d) 427 (C. C. A. 7). Omission to complain in time persuasively suggests that even counsel, deeply interested in the case, were not then so impressed with the significance of the misstatements as to call the

court's attention thereto. Generally it may safely be said that, if such misstatements did not at the time sufficiently impress counsel as being harmful, it is not likely that they materially affected the jury.

▮ A statement in argument [1] respecting the nonproduction of character witnesses for appellants was likewise first presented through a motion for new trial, and does not appear in the bill of exceptions. What has just been said above has like application here.

Assuming that the bill of exceptions showed this statement, it must be conceded that such a statement by the prosecutor was highly improper. If a defendant offers no character evidence, comment by the prosecutor in argument on the omission is not permissible. Middleton v. United States, 49 F. (2d) 538 (C. C. A. 8); Lowdon v. United States, 149 F. 673. (C. C. A. 5); McKnight v. United States, 97 F. 208 (C. C. A. 6). If it were otherwise, no defendant could safely rest his case without producing evidence of his good character. Had attention been timely called to such statement in argument the court would doubtless have instructed the jury to disregard it and have reproved counsel for making it. Prosecutors especially should scrupulously observe the rules and proprieties of argument.

▮ The main attack is upon the court's denial of appellants' motions for a directed verdict, predicated upon the contention that the evidence fails to support the verdict.

The theory of the prosecution seems to have been that the alleged conspiracy originated during Dale's campaign for election to the mayoralty of Muncie, and continued long thereafter. The record affords substantial evidence tending to show that during that time it was arranged and understood between Dale, Massey, and certain others, including so-called "bootlegger" defendants Johnson, Flatters, and Kubeck, that in case Dale was elected Massey would be chief of police, and that some persons, including some of the defendants, would be permitted to engage in or to continue in the sale of intoxicating liquors, others in running gambling houses, and still others in conducting houses of prostitution in Muncie. It was testified by witnesses that Massey not only made such representations and promises, but that in some instances, even before the election, he was collecting tribute or protection money from certain bootleggers and gamblers, which payments he continued to collect for some time after Dale was elected and he (Massey) was appointed by Dale as chief of police. It was testified that upon the strength of such representations and undertakings considerable campaign funds were collected and paid to Massey and others to further Dale's election.

It was not testified that Dale directly made such promises or entered into such undertakings, or that he received any of the money that was contributed, either as campaign funds or for so-called "protection"; but there was evidence that before the election Dale told persons interested in the liquor business that if he was elected Massey would be chief of police, and anything Massey said was going to be all right with him.

Witness Cranor, a bootlegger, said he asked Massey how certain bootleggers could go right along in view of Dale's election promises to clean up, and Massey said that he could arrest a score of bootleggers every day and that would satisfy the church people; and that the selected few who would help Dale at the election would be unmolested, and the public would not think anything about it. A number of persons who were unlawfully selling liquor testified that Massey told them if they would support Dale for mayor they might continue to sell liquor, and that they accordingly did support Dale.

The record affords many instances where defendants who were bootleggers had been protected in their traffic through the evident influence of Massey and Dale, and were permitted unlawfully to sell, or continue to sell, intoxicating liquor. It shows also instances where raids were made and bootleggers' places closed up. It was testified that defendant Flatters' place was raided and Flatters arrested just after he had paid Massey $75 for protection, but that upon Flatters' com-

[1] "In my opinion, you have witnessed a very amazing spectacle here, one of the most remarkable you may ever witness. You have seen a mayor of a city of fifty thousand people go on trial, together with the Chief of Police, a Captain of Detectives and a member of the Board of Safety and other confidants, and be tried here for a serious crime and, out of a city of fifty thousand people, who was there that testified for him? What character witnesses did any of them have all through their trial here? And their character for honesty and fair dealing was at issue, and did you hear one single solitary character witness from Muncie or anywhere take the stand and say that George Dale's character for honesty, in the community in which he lives, was good? When these defendants took the stand, their character and their reputation for truth and veracity immediately became an issue, and who was it that sat on the witness stand and said that George Dale's reputation, in the community in which he lives, for truth and veracity is good? Not one out of fifty thousand people came to the rescue of these men and told you about the confidence or the trust that they have reposed in any of these defendants, and those are things, gentlemen, that you may consider."

plaint he was released; and it was testified that thereupon Dale stated Flatters could sell liquor in the uptown district, and a witness said that the agreement was that Dale was to get 40 per cent. of the profits.

It appears that one Bohlinger, who was employed by Dale as a detective, bought some liquor from Kubeck, and that Dale told Bohlinger not to bother Kubeck, who had worked for Dale during the campaign; and that he told Bohlinger and the police not to bother his friends who were selling liquor.

The instances are quite numerous where it was testified, in effect, that Dale directed that certain bootleggers be raided and that others remain undisturbed.

It was testified that defendant Stilson, who evidently was a recognized figure in the liquor traffic, frequently went to Dale's home in the evening, where occasionally he met Bohlinger; and that Stilson was quite influential with Dale. It was testified that one policeman who would not take orders from Stilson was the next day suspended from the force.

Witnesses testified that on a number of occasions Dale had been at places in and about Muncie where liquor was being freely sold, and that he drank liquor at such places, and on a number of occasions was intoxicated.

It was also testified that while he was mayor he and Massey arranged to procure a considerable quantity of whisky, and to have it transported from Muncie to Indianapolis, to be used at a Democratic convention to be held there; and that such liquor was accordingly transported to Indianapolis and freely used there under the sanction and participation of Dale and Massey.

While the personal use of intoxicating liquor by defendants is not of itself a crime, and while specific acts of law infractions—such as collection of protection money, unlawful or unwarranted arrests, and failure to enforce the law—are not here charged, yet all such instances as have been related have evidentiary bearing on whether the participants therein had such previous understanding or arrangement for the violation of the law as would constitute the conspiracy which the indictment charged.

While the Indianapolis incident of itself would afford evidence of an understanding between those who participated in it that intoxicating liquor should be possessed and transported in violation of the law, we consider it here, not so much in the light of a separate conspiracy, but as one manifestation of a prior general understanding that intoxicating liquor be possessed, sold, or transported in defiance of the federal law.

There was evidence to indicate that this general purpose and intent found further manifestation in a deliberately planned undertaking to thwart investigations by the Federal Prohibition Department into conditions prevailing in and about Muncie, resulting in numerous interferences by or on authority of all of the defendants whose appeals are under consideration. This was indicated by evidence of the watching of government agents by members of the police force under order of the mayor and chief of police, the keeping track of persons who came to and from headquarters of the government agent, threats by the mayor, and frequent clashes between federal agents and the police and arrests of federal agents.

There appears such evidence of facts and circumstances tending fairly to connect Dale and Massey, as well as defendants Flatters, Stilson, Johnson, Kubeck, and some others not indicted, with a general purpose and plan to cause intoxicating liquors unlawfully to be possessed, sold, and transported within the judicial district, and to show the commission of some of the overt acts alleged to have been done in furtherance of the plan, as to negative the contention that the verdict and judgment are unsupported by evidence.

Appellant Ellis was appointed by Dale to be a member of a board of safety consisting of three. Just what its functions were does not definitely appear. It seems to have exercised some sort of supervision over the police. There was evidence to indicate that Ellis protested against prosecuting the "Pig Stand" for unlawful selling of liquor, and that he told witness Bohlinger, who was then acting as a city detective, not to bother the Pig Stand but to "get" another place which was across the road. The principal evidence against Ellis is that a number of times he came to the rescue of the Pig Stand with the evident determination that it be not prosecuted. There was also evidence of his activity to prevent the federal officers from making an investigation of liquor conditions in Muncie. While the evidence tends to show his own undertaking to obstruct the administration of justice, we are of the view that it comes far short of showing his participation in the conspiracy which the indictment charges.

Appellants Davis, Horstman, Nelson, and Powell were police officers. It was shown as to them that on different occasions they were at places where liquor was being sold unlawfully, and that they drank liquor; and that

in some of such cases they made arrests, and in others they did not. We do not think that this of itself indicates their participation in a conspiracy. They were city policemen, under the direct control of the mayor and chief of police. Their failure to do their duty would subject them to suitable correction; and such dereliction might, in connection with other evidence, indicate such a plan or purpose to participate in violation of the law as would amount to conspiracy, but of itself would not establish that they were parties to a conspiracy, even though their failure to perform their duty was upon the direction of their superior officers. Other evidence concerning them, while in some instances tending to show individual acts more or less discreditable, fails to indicate such a conscious and purposeful intent to participate in a conspiracy to violate the federal law as would be essential to justify conviction upon such a charge.

 There was considerable evidence tending to indicate that a number of the important witnesses for the government were much biased against the defendants, particularly Dale and Massey. Bohlinger was a sort of chief of detectives under Dale until they had a falling out, and then Dale dispensed with his services, whereupon Bohlinger aligned himself with the prohibition forces to procure evidence against the defendants, or some of them. His evidence indicates he was probably no less a conspirator than any of the defendants. Witness Simms had for some time been a police officer and was discharged by Dale. Corbett Johnson, a bootlegger who said he was paying Massey protection money, and who said he bought from Massey while chief of police twenty gallons of seized alcohol at $2.50 a gallon, was for some reason required to leave Muncie. Duncan, who had been favored by Dale and had been employed by him, testified that Dale had abused and assaulted him. He had been in all sorts of trouble, and was evidently an unsavory character. Randolph, whose testimony was important on the Indianapolis convention incident, was appointed by Dale to the board of works, and later "fired" by Dale. Situations more or less similar might be noted as to others who testified for the government. Such relations bear upon the animus and motives of the witnesses, and affect their credibility and the weight to be given their testimony; but it is too well settled to require demonstration that federal appellate courts may not pass upon the credibility of witnesses or the weight to be given their testimony, these being matters peculiarly and exclusively within the province of the jury and the judge presiding at the trial. It is equally well settled that the disposition of a motion for a new trial rests within the sound discretion of the trial judge, and that error is not predicable upon his action thereon.

We are of opinion that the District Court did not err in denying the motions of appellants Dale and Massey for a directed verdict, and no reversible error appearing as to them the judgment as against them is affirmed. We are of opinion that as to appellants Ellis, Davis, Horstman, Nelson, and Powell the District Court erred in not sustaining their motions for a directed verdict, and for this error the judgment as against them should be, and it hereby is, reversed, and the cause as to them remanded for another trial.