### UNITED STATES v. KORTEPETER.

### SAME v. DERBYSHIRE.

### Nos. 7176, 7177.

Circuit Court of Appeals, Seventh Circuit.

July 22, 1940.

Rehearing Denied Sept. 24, 1940.

Writ of Certiorari Denied Dec. 16; 1940.

See 61 S.Ct. 392, 85 L.Ed. ——.

Paul Y. Davis and Floyd J. Mattice, both of Indianapolis, Ind., and Samuel D. Jackson and James P. Murphy, both of Fort Wayne, Ind., for appellants.

Val Nolan, U. S. Atty., and B. Howard Caughran, and Paul A. Pfister, Asst. U. S. Attys., all of Indianapolis, Ind., for appellee.

Before EVANS, TREANOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

Appellants challenge judgments of imprisonment and fines imposed after verdicts of guilt were rendered against them. They were charged with fraudulently diverting W.P.A. funds, fraudulently diverting W.

P.A services, and conspiring to defraud the United States by doing the aforesaid, and other illegal acts.

Their alleged misdeeds arose out of the use of W.P.A. labor and funds in laying two streets in a fourteen acre tract of farm land owned entirely by Derbyshire, who was planning to subdivide the tract. Kortepeter, his son-in-law, was the "co-ordinator" of the W.P.A., and in charge of "operations" and projects, in the county in which the land in question lay.

The errors assigned by appellants are,— the exclusion of evidence which would have shown that many other similar projects were contemporaneously carried on; that the court should not have submitted to the jury without instruction, a governmental communication issued after the commencement of the project, prohibiting W.P.A. participation in projects dealing with privately owned subdivisions such as here involved; a highly prejudicial argument made by the District Attorney; and insufficiency of the evidence to support a verdict against either defendant. In other words, all the evidence was consistent with innocence and defendants were in fact guiltless of intentional wrongdoing.

The Facts. Mr. Derbyshire conceived the idea, in 1924, of subdividing a fourteen acre tract by him owned and he platted the same, but at the time did no more. Years later when he consulted his son-in-law, Kortepeter, the latter advised him that he would first have to dedicate the streets to the county, first having the land surveyed and blueprints made of the layout of the lots and streets. Derbyshire did this, and made an offer of dedication to the county, which offer seems to have been approved by the county commissioners, but it was stipulated the dedication was never recorded.

Kortepeter was first associated with the F.E.R.A., predecessor of the W.P.A., in 1935, and became supervisor of operations in Marion County, Indiana; later, in August, 1937, he was Acting Supervisor of Operations and Acting Coordinator. As Supervisor of Operations he "worked up" and "got different types of projects that relief labor could work on."

Projects, to be accepted, required the sponsorship of a governmental agency such as a city, county, or township. Projects were first "set-up," that is, they were "made out," proposed, or originated in the operations department, where they were super-

vised. Of this department Kortepeter was the district head.[1]

*Sufficiency of the evidence.* Appellants earnestly insist that all their acts were legitimate and permissible under the law; that the roads constructed were within the purview of authorized works.

We are satisfied that the evidence was such as to require this question to be submitted to the jury. The most that can be said of the evidence is that a jury might, if it accepted defendants' version, have found them not guilty. The court was not justified in directing a verdict in their favor. The statements contained in the project proposal and Presidential letter are stubborn insurmountable obstacles in defendants' way. Their clear purport is authority for improvement of roads *then existing.* Persuasive, too, are the bulletins, State No. 103, dated July 15, 1938, and Federal No. 190, dated July 12, 1938 (hereafter quoted), which limit the scope of projects on private lands. They would seem to clearly prohibit the type of project here made the basis of this prosecution.

There was evidence that these specific bulletins did not come to the attention of appellant Kortepeter. Opposing this is evidence that they should have come to his attention in the course of regular governmental procedure ordinarily followed. We think it was for the jury to determine whether such governmental instructions were received by the defendant Kortepeter.

To substantiate our conclusion, we set forth verbatim the pertinent part of the project proposal which led to the issuance of the Presidential letter:

"During the Spring in Marion County an extreme amount of damage was done to many miles of bituminous and gravel roads. Heavy rains washed out many of the shoulders and portions of the road and in some parts of the county even the entire roadbed was destroyed. The present budget of the sponsor makes it impossible that the necessary rehabilitation expense be borne by that unit of government. However, the sponsor is willing to provide from the present budget sufficient funds for necessary materials and equipment. The re-

sulting work will provide a hard surface belt only on farm-to-market highways in this county. In reconstruction and the rebuilding of these roads it is planned to widen them to meet the contemplated increase in traffic. Accordingly, the culverts, small structures and bridges must be widened and rebuilt. As they are included in the right-of-way, this necessary work is reflected in our application."

This statement discloses throughout a wording which indicates that repair of existing roads is the only legitimate basis for "projects." The words used, such as "rehabilitation," "reconstruction," "rebuilding," refer to improvements in existing roads. Other phrases specifying the kind of work to be done—widening, repairing shoulders, "culverts," confirm this impression.

It is most significant that the Letter states that "The resulting work will provide a hard surface belt *only* on farm-to-market highways in this county." By no stretch of liberal interpretation could the two roads or lanes here involved, one leading to a creek be considered as part of any such highway system.

The Presidential Letter, the official sanction for the project, described the project authorized to be to

"Improve county-owned roads throughout Marion County including widening; filling; grading; draining; cutting ditches; shaping berms; surfacing; clearing; resetting fences; landscaping; improving and constructing small bridges; culverts, and other structures; painting; and performing incidental and appurtenant work. Not a part of the Federal Aid Highway System. * * *."

Again the deduction is inescapable that the project concerned existing roads. Note the words,—"the character of the construction work permitted," "widening"; "cutting ditches"; "resetting fences"; etc.

The only reasonable interpretation of these two documents excludes the original construction of new roads on a privately-owned farm tract. Naturally one is prompted to ask,—Where was the public benefit to be derived from this construction?

---

[1] Applications for projects and "proposals" (the two necessary documents for initiation of projects) are made up in the operations department and taken to the governmental sponsor for detailed execution. The project application and proposal are then sent to Washington for approval and are the basis of the "Presidential letter" authorizing and approving said project.

Defendants must have known or at least had good reason to question the legality of a work, the entire benefit of which was to enure to the owner of a tract of land not yet subdivided.

Washington Bulletin No. 190, issued July 12, 1938 (about the time the survey was being made of the tract, and before the actual work of construction was begun), provided:

"The project must come within the limits imposed by the current rules of eligibility for W.P.A. projects."

"The streets * * * must be dedicated to the municipality * * *. The dedication must have been accepted *and recorded* prior to an expenditure of Federal funds on the project."

State Bulletin No. 103, dated July 15, 1938, and according to the evidence probably distributed within a few weeks thereafter, provided:

"General Letter No. 190 * * * is hereby made a part of the Indiana procedure."

"It shall be noted that the improvement to streets * * * in undeveloped areas where the abutting property is in the hands of a small number of individuals * * * is ineligible. This means that such work cannot be prosecuted *on approved projects operating* or to be operated, and such work shall not be included in project applications."

█ While it is possible that these documents did not reach appellant Kortepeter before he acted, or did not come to his attention if they reached him, the evidence was conflicting and was for the jury.

We are also convinced that in the absence of express authorization, it must have been apparent to both defendants, that the expenditure of money and labor for private gain, such as here disclosed, was illegal.

*Rulings on evidence.* Error is assigned because the trial court sustained objection to the cross-examination of a government witness relative to the widespread existence of similar projects under W.P.A. auspices. The Government contends that such evidence was incompetent because it merely shows that other similar crimes were being committed. Defendants, especially Kortepeter, contend that such was not the object of this testimony; that it was offered to prove absence of intent to commit a crime. In other words, a criminal's intent could not be attributed to defendants when many others, including superiors, were doing the same thing and in the honest belief that such acts were legal and legitimate.

The question asked was:

"Q. Now, do you know whether, in anticipation of that work in different places where it was done, whether it was at the direction of the county or at the WPA direction?"

The District Attorney objected to the question as immaterial, whereupon the record discloses the following colloquy ensued:

"The Court: Unless it applies to this,—

"Mr. Mattice: Well, it is, of course, part of the whole system of carrying on the work and I think, if the Court please, it is germane on the question of intent, which is involved here.

"The Court: If other offenses were committed, of course, that isn't a defense in this case.

"Mr. Mattice: It isn't a defense in this case, but other offenses are always proper evidence as bearing on the question of intent.

"The Court: On the part of the defendant?

"Mr. Mattice: Yes. It is available to the Government's side of the case and usually it does come out the other way.

"The Court: I think that is right.

"Mr. Mattice: But it may also be available to the defendant.

"The Court: I doubt it.

"Mr. Mattice: May we have an exception, * * *.

"The Court: Yes."

█ It is quite obvious that the ruling, if erroneous, was not prejudicial. Other testimony in abundance brought out what counsel for defendants asserted was the purpose of this rejected evidence. For instance, in Kortepeter's testimony, he said:

"There was discussion in the office of the WPA between myself and my superior officer, Mr. Jennings, about the matter of carrying on the kind of work that we had been doing there in Marion County, under the County-wide Project, up to the time I left. We had discussions about the work almost every day. *He told me about numerous places similar to it (Derbyshire), that he wanted work done. I mean work in subdivisions and areas where one person or a few persons owned. That occurred many times.*"

128

Aside from the absence of prejudice, we are convinced that the court correctly excluded this testimony.

■ Actions which are unlawful can never be made lawful by the mere fact that many other citizens are indulging in like unlawful activities. If a defendant could establish an absence of evil intent by showing that many others are engaged in like criminal activities, there would have been few convictions under the National Prohibition Act.

Despite all explanation and attempted efforts to soften the features of the picture presented by this record, it is perfectly clear that the two defendants used W.P.A. funds and W.P.A. labor to enrich defendant Derbyshire by improving his private property. It would obviously have been improper for Kortepeter to have erected a mansion on Derbyshire's property for him. It was likewise improper to improve this property in the manner disclosed by the testimony, unless such improvements were within the authorization of the Act and of the Presidential letter. Having failed to bring the work within this statutory authorization, avoidance of consequences can not be made to turn upon the misconduct of others who likewise enriched themselves at Government expense through the improvement of their private property.

*Argument of Counsel.* The District Attorney in arguing to the jury is charged with saying:

"That if the jury would go along with him and return a verdict of guilty against these defendants on trial, that he promised that, and he called upon the Judge of this Court to bear witness whereof; that he would ask the Court to call a Grand Jury for January 15, 1940; that he now had certain facts concerning W.P.A. matters; that he would present same to that Grand Jury and would obtain all indictments which that evidence warranted, against all persons, be they in high or low places, in connection with work of the Works Progress Administration in the Southern District Of Indiana, and that he would prosecute all persons thus indicted, if this jury (meaning the jury before which these defendants were on trial) would stand by him and return a verdict of guilty against these defendants."

In answer to this allegedly prejudicial statement the District Attorney asserts that no exception was taken at the time of the argument and none could well be taken because the defendants, from the beginning to the end of the trial, had goaded and attacked the District Attorney for not prosecuting other offenders whose private property had, allegedly, been made more valuable through W.P.A. improvements.

■ While we adhere to the long list of cases, of which a few are cited herewith [2] which hold that exceptions should be taken to remarks of counsel before they may be successfully attacked on appeal, there are other reasons for refusing a new trial because of these remarks. If we accept the prosecuting attorney's statement of the situation there were stronger than ordinary reasons for requiring defendants' counsel to except to the language of the District Attorney. He says that if objection had been made and an exception noted he could and would have had all the argument preserved verbatim. He could have had opposing counsel's assault on the conduct of his office also taken down in shorthand and the same would have afforded justification as well as an explanation of his remarks.

We are convinced that no error occurred in view of the explanations made and the absence of exception by defendants.

The judgment is affirmed.

[2] Dale v. United States, 7 Cir., 66 F. 2d 666; Crumpton v. United States, 138 U.S. 361, 11 S.Ct. 355, 34 L.Ed. 958; Cain v. United States, 8 Cir., 19 F.2d 472; Warfield v. United States, 5 Cir., 36 F.2d 903; United States v. Goodman, 7 Cir., 110 F.2d 390, decided February 15, 1940; Lucking v. United States, 7 Cir., 14 F.2d 881; Vause v. United States, 2 Cir., 53 F.2d 346; Murphy v. United States, 8 Cir., 39 F.2d 412; Hoffman v. United States, 8 Cir., 20 F.2d 328.